May it please the Court, my name is Abigail Barnes, representing Plaintiffs' Appellants, the Presidio Historical Association, and the Sierra Club. With the Court's permission, I would like to reserve three minutes for rebuttal. Manage your own time. I'll move the microphone just a little closer to you. Thank you. At stake today is the future of the historic Presidio of San Francisco, a National Historic Landmark District, entrusted to the protection of the Presidio Trust. In its pursuit of new development, the Trust has lost sight of its core mandate to protect the Presidio from development. We therefore ask the Court to reverse the District Court, first because the Trust's planned new construction violates the clear language of the Presidio Trust Act, and second because the Trust has failed to comply with its affirmative duty under the National Historic Preservation Act to minimize harm to the landmark. The Trust Act gives the Trust broad authority in the repair, rehabilitation, and management of existing structures throughout the Presidio, and it also gives the Trust broad authority and broad discretion when it comes to demolition of structures that cannot be cost-effectively rehabilitated. But Congress imposed a narrow and unambiguous constraint on new construction consistent with the purposes of the Trust. The language of Section 104C3 of the Trust Act is clear. New construction is limited to the replacement of existing structures of similar size in existing areas of development. Replacement has a plain and ordinary meaning here, to put something new in the place of or put back in the same place. And the words of similar size reinforce this meaning. This must be a structure-by-structure analysis when the Trust is looking to do new construction, first after they've demolished, then looking at whether they should replace with new construction, and then how that new construction should look. And if it can be— What is the purpose and meaning of the end of the phrase, of the sentence, in existing areas of development? Your Honor, this phrase means—is simply a further limitation on the Trust's replacement construction authority. It limits which buildings, which structures, are eligible for replacement under this provision to only those that are in developed areas. That is, an isolated building may be eligible for demolition under 104C1 or 2, but it is not then eligible for replacement new construction under 104C3. And this is consistent with the purposes of the Act, to preserve the scenic and recreation areas and to really only protect those historic structures throughout the Presidio. One of—as I read the brief, one of the statements was to the effect that the statute means roughly the same size and roughly the same place. And so if something is roughly something, how can you divine that from a statute that you say is unambiguous? Your Honor, we believe the statute is unambiguous, but it does not have—it is not inflexible. The words of similar size in particular say that this replacement new construction does not need to be an exact replica of a building that the Trust has demolished. It does not have to be exactly the same size. Perhaps the footprint could shift a little or the orientation of new construction. But it must be structure by structure for this phrase to be—to make sense. And how do you get the structure by structure? Basically, as I understand it, it's got to be the same structure in the same footprint, more or less. Is that your view? Yes, Your Honor. That is our interpretation. We do believe the Trust has some flexibility. For example, they could replace two buildings next to each other with one or perhaps vice versa. But they must be looking at which building they are replacing when they approve a new construction plan. I'm sorry. Did you just say that it's acceptable in your view to replace two structures with one? We think that could be an acceptable interpretation. We think this is not— Why isn't the Trust's interpretation acceptable in this context if they confine it to a certain area with adjacent lots? I'm sorry, Your Honor. Could you repeat that? Why isn't the interpretation of the Trust acceptable then if it's in—if it involves adjacent buildings, even if they aren't connected? Your Honor, what the Trust is proposing here is so far from a one-for-one replacement. Instead, we have one building that's been demolished and 12 new buildings, more than double the square footage on a much broader footprint that the Trust is putting roughly in its place. But if two-for-one is acceptable, why isn't three-for-one or four-for-one? Your Honor, we would believe that could be acceptable if those structures still stayed roughly the same size as the building that was demolished, but that the square footage would have to be approximately the same. And here, where you're doubling—more than doubling the square footage, you're putting in 12 new buildings, and the only way you're doing this is by using demolition that's occurred throughout the Presidio, nowhere near this site, to offset this new construction with demolished square footage. We think that can't come from the plain language here. The plain language— Well, it's not really fair to say that the demolition is throughout the Presidio because, as I understood the Trust's proposal and argument, is that it's in the vicinity of where Building 34 was, and there are other buildings that were on the Doyle Drive. So it's not—they're not claiming they could do it throughout the Presidio and, in effect, bank that, are they? Well, Your Honor, the Trust makes two arguments. One is that they can bank square footage throughout the Presidio to replace in any other area of development. The other is that it must be limited to one area, but even under—their numbers don't add up for this project under that interpretation, which is why they've added the words, in the vicinity of an area of development, to pull in this demolished square footage from another project that is not actually on the main post. And the Trust does argue that it's close enough, but really this just shows how meaningless a limitation this would be. The Trust can redraw their planning boundaries as they see fit. So even a limitation to replacement within one area would allow them to fill in the main parade by demolishing structures in and around the main post with new construction to break undeveloped land. Well, there are two different problems. One is what they may be arguing they have a right to do, which may be excessive. And two, whether what they are proposing here complies with the restrictions in the statute. And some of the argument that you're addressing goes to their claims rather than their proposal. So as to the proposal, as far as I can see, the complaint you have that is basically legitimate is that they are taking buildings from outside of the area of development and including those buildings on the theory that, well, it doesn't mean just the area of development. It means anything near the area of development. Is there anything other than that that you find offensive about this proposal as opposed to their original proposal? Yes, Your Honor. This proposal, the only real replacement that is happening here is of the already demolished Building 34, which is approximately 32,000 square feet. The new construction, even as it's been modified, will be about 70,000 square feet of new construction in an area that will completely divide the main parade and old parade grounds, a much greater footprint, much more construction. We think that simply can't be what Congress meant when they put in this limitation of new construction to the replacement of an existing structure of similar size, that that can't be or of double the size and in a much greater area. You began your argument by noting that Congress provided broad delegation. So if your interpretation is simply different from theirs, why aren't they entitled to Chevron deference? Well, Your Honor, we believe the trust would only actually be entitled to Skidmore deference in this case. But under either deference review, their interpretation here is just unreasonable and it goes clearly against the intent of Congress. The trust was put in place to protect and preserve the Presidio. And they are reading into this phrase, in existing areas of development, a management scheme, a banking scheme that would allow new construction throughout the Presidio with only the only existing area of development is if it's the same existing area of development, that's not what it means throughout the Presidio. So your argument is existing area of development doesn't mean the entire Presidio. If it means the same administrative unit of development, that's not nearly as expansive an interpretation. It's not, Your Honor. But we still lose the word replace there. We're still getting away from the idea of looking at a demolished structure and designing new construction to replace it that will be of similar size. And instead we have this complicated banking scheme that we really can't, that provides no accountability. Even within an area of development, the trust could do wide scale demolition, which we agree they have broad discretion to do, but then That's back to the footpath argument, that they can only reconstruct exactly where they had, by exactly, I mean, like similar. Those are words that don't, well, exactly means exactly, but similar means not precise measurement, but it's a building that's approximately the same genre, basically. Yes, Your Honor, it does. But if, I realize it's in the plural, but if you read the statute to say of an existing structure of similar size in the existing area of development, then there would be nothing wrong with this except for the 30,000 or so feet that are not in the area of development? Yes, Your Honor. If the trust constrained this new construction to approximately 32,000 square feet and kept the footprint closer to where Building 34 is and hadn't stretched it out so far, then we would not object to this proposal under the Presidio Trust Act. So you wouldn't object, for example, if we take the 31,000 feet of Building 34 and they decided to make six 5,000 square foot buildings, which of course couldn't be right on top of each other, but would need to be spread out over some space. And they would, or what if they made 12, but each one was just one story and not two stories? That would be okay because it was within the 31,000? We think that of similar size there would be satisfied. And the question for the Court in that scenario would be, was that replacement, was it close enough to where the original buildings had been to count as putting something back in the same place under the ordinary meaning of replacement? So if you had six to 12 buildings, albeit smaller than the total they proposed, that would fit within the statute in your view? Yes, that could conceivably fit within the statute in our view. And that fits in the statute because you need to insert some words to basically say within the general vicinity or what would you insert there to make it comport with the statutory language? I'm sorry, if it was of similar size, then we would agree that that was satisfied. And then the question would just be, is it close to constitute replacement? So how are we supposed to measure that? I mean, you say it's too far away. How can we, as an appellate court reviewing an agency decision, decide for ourselves what's too close and what's too far away? Well, Your Honor, we don't think this really is a question the Court needs to decide. What's happened here is so far from this. Well, no, I think actually we do under your argument because your argument is that they're taking square footage that's too far away. If in fact that square footage were as within your rubric of closeness, then there's no problem, is there, in terms of the statute? Our problem, Your Honor, would be the aggregating that square footage together. If these buildings were next to each other that they were replacing, maybe that could be replacement construction. But here we have one building that may qualify as true replacement and the rest of this square footage is not coming from any particular project. Instead, it's simply demolished square footage that the Trust has recorded as available for future projects. And this is evident, particularly in their brief, where they talk about how they have 30,000 extra square feet of new construction authority based on demolition in other areas. Right, right. But that question really is in front of us and the District Court didn't pass on that, did it? No. I mean, they could be just wrong about that. You know, they may be at the end of the line on their expansion, we don't know. But as we've given you the possibilities of what might be done, they could divide the parade ground, they could spread it out on the parade ground, but it wouldn't be the same footprint. So I guess that if I interpret your argument right, you're now giving up on the same footprint and saying general vicinity. No, Your Honor, I don't believe that we are arguing that. Rather, it must be a structure by structure analysis. And perhaps the footprint can shift a little bit, but the question is always... But you said it could shift up to six buildings worth. I apologize, Your Honor, if I... Well, I'm just trying to understand how far the rubber band is going in the parade ground in terms of where the buildings might be put within your definition of the statute. So I don't want to put words in your mouth. I'm just trying to understand. Yes, Your Honor. We think it must be close to the existing structures. The statute... But again, how do you measure close? How are we supposed to define close, and where do you find that in the statute? We find it in the word replacement, Your Honor. And we look at whether the proposal is close enough, is putting something back in the same place as a structure that has been demolished and is of similar size to that demolished structure. And what we have here is just so far from that. The trust is using the demolition of this one building to justify 12 new buildings spread over a much, much greater area. So how far from the original parameters of Building 34 is the furthest stretch in the proposal? I don't have an exact number for you, Your Honor. But the proposal moves from one building to 12 buildings that would divide the two parade grounds. But I understand that one of your objections is dividing the parade ground, right? Yes, Your Honor. Under the National Historic Preservation Act, we believe that causes harm to the historic integrity. But you could divide that ground with two buildings, too, couldn't you? Yes, Your Honor, but the harm... I don't understand how does it fit. Your Honor, we think that these two statutes must be read together. And what may be okay under the Presidio Trust Act as new construction does not necessarily avoid harm to the landmark under the National Historic Preservation Act. Under the Trust Act, we're really just looking at whether this proposal meets the Congress's definition for new construction, limitation on new construction. But the argument about the harm to the historic integrity really goes to their affirmative duty under the National Historic Preservation Act as a federal agency that's going to undertake a project that will harm a National Historic Landmark District. I realize that your argument under the Historic Preservation Act is that it's... these are substantive requirements, not procedural requirements. But assuming for the sake of argument that they are only procedural requirements, do you have a procedural objection to what the trust did here? Yes, Your Honor. And what is that? The trust has two obligations under Section 110F of the National Historic Preservation Act. A consultation requirement to consult with the Advisory Council and the National Park Service, which mirrors their obligation under Section 106, and which is not at issue here. But also a separate affirmative duty to minimize harm to the maximum extent possible to the landmark. And that has never... that certainly has not been done here, where there will still be harmful effects from... I mean, in your argument it's substantive, but if I'm saying it's just procedural, that they have to try to make steps to minimize it. What's your procedural objection? Even if it's a procedural requirement, Your Honor, the trust has never considered, never fully considered, its duty to the landmark, separately from the consultation process with the Council. This first part of Section 110F looks at harm to the landmark, not the effects of the undertaking. And that is the only thing they've addressed under their consultation, which again is not at issue here. With the Court's permission, I'd like to reserve the remainder of my time. Certainly. Thank you. May it please the Court, Katherine Barton with the Justice Department for the Presidio Trust. When, you know, when the Presidio... when Congress was considering the Presidio legislation in the mid-90s, the Republicans had just taken over both houses of Congress and were proposing to sell off the Presidio to reduce the federal deficit. What resulted was the Presidio Trust Act and the creation of the Presidio Trust, which has achieved the dual goals of that act, making it financially self-supporting two years ahead of when it was required and preserving... doing many projects and getting very far in preserving its natural and historic resources, the latter for which it's won 26 Historic Preservation Awards, including two Governor's Awards. Part of the reason it's been able to do this historic preservation is because of the flexibility of the new construction provision in the Trust Act. One of the things it allows them to do... You think they could have built a ten-story high building? They can't build a ten-story high building. First of all, the Congress told them to develop a plan, a management plan, to guide the management of the Presidio, of their portion of the Presidio, and that is the 2002... Let me interrupt. Was that the original proposal by the Trust? I'm sorry. So, yes, the original plan in 2002 sets the planning for all of the Presidio generally and includes standards generally for what can and can't be done in terms of construction within the Presidio. And that included a ten-story hotel? It requires that the buildings be of an appropriate characteristic for the surrounding historic environment. But you now say that would not be appropriate. Excuse me? I said, are you now saying that would not be appropriate? No, I'm saying that they are bounded by other mechanisms, other provisions than the new construction provision, which I think is very broad. But the Presidio Trust's own 2002 plan sets all the basic policies for what they can do. They have to go through the Section 106 process. They have to go through the 110... I don't understand what it is the government thinks would be appropriate, what you can do under your authority. And that includes you could have built a ten-story hotel, is that right? No. No. You said they could not have built a ten-story hotel? Right. They could not. Okay. Fine. Excuse me. I'm saying they could not, not because of the new construction provision, which actually under the theory that the plaintiffs just set forward, I mean, they could now take down all of the Letterman Digital Arts Center, which they already replaced the high-rise with a nice more 45-foot set of buildings, and they could put the high-rise back up. So that interpretation cannot stand. I don't quite understand why you think they could do that. I thought they were saying it had to be a similar-sized building. I think they were saying a similar aggregate size. But regardless, that is not something that the trust would consider acceptable under the Presidio Trust Plan. And every time- But I gather the government's position is that the initial proposal, which was 265,000 square feet, was permissible. You know, I think at that point, I actually have not looked at that. I assume they had square footage somewhere to offset it. But clearly, that's what happened, is it went through the process, and it was- They made changes not necessarily based on the government's interpretation of the legal restrictions. But that's exactly what I'm saying, is that it's not- The restriction on the size of construction, I don't believe, is found in that provision of any particular construction. And that's for- Let me give you two examples. One is, for example, 90 percent of the new construction that has occurred to date on the main post are annexes to existing buildings that have allowed them to have tenants and be used, which is critical for historic preservation. Unoccupied buildings are not- cannot be- It's not a good way to preserve. You have to- So that has been almost entirely not separate new construction, which under their theory it has to be, but what is needed at the time- Both theories are incorrect. But let me ask you a question about what's actually going to happen here. Is the yardage or this footage that's excess to what's in the main port area, the port that's out of the area of development in a different area, is that critical to your proposal here? It's not necessary for the lodge. It is necessary for the total development of the new- for the main post update as a whole. And let me say that those buildings- What do we have to decide here? Do we only have to decide what's necessary for the lodge, or do we have to decide anything more? I think- I want to explain to you why it would be problematic to hold that the main post update was not- did not satisfy the new construction provision. Well, I wasn't asking you whether we should do that. I said, do we have to decide that? I'm not- the agency decision is approval of the main post update. Right. So, I mean, that's- and that's all the district court decided. True? No, the main post update- Right. I mean, within that is subsumed the lodge. It would seem awkward to pull out the lodge separately. I don't think that's probably- I think Judge Thomas and I had opposite reactions to what you said. I think he was suggesting that we don't need to decide more than the area of the lodge. And I understood you to be saying that we shouldn't pull the lodge out of the proposal, but we should decide the whole proposal. I may- perhaps I misunderstood Judge Thomas. I do think that the agency decision is approval of the main post update. I haven't thought through whether you could just- Includes more than the lodge. It includes- It does include more than the lodge. How many square feet is the main post update? So, let me pull that out. A good place to look at the new construction is- yes. At- it's in the main post update itself. It's on excerpts of record 389. And it provides- you can see, actually, building by building. You can see how the- in looking at that, how the lodge could be justified. But the overall acreage is of planned demolition and- well, actually- and so this doesn't include, on this page, you have to also include the additional- right, so this shows- Could you just- Excuse me. Let's just answer the question- I know. I'm sorry. around the buildings. Do you know what I'm saying? So, why don't you tell me what, in your view, the total square footage is on the main post update? The total- so, the total new construction from the beginning of, you know, the creation of the Presidio Trust's management is 146,500 square feet. And the lodge portion of that- Is 70,000. 70,000. Okay. And the 70,000 is going to go in the vicinity of, but not- but be larger than building 34, which was 31,000 feet, correct? Right. We are looking at the- at what is in the main post update as a whole. And it is- which is not a boundary that has any meaning for the statute. And, in fact, is not the boundary that the Park Service had in the general management plan that existed when Congress approved the statute. That boundary included the two large buildings, 605 and 606. So, I don't see any reason for excluding these buildings that are just on the edge under the statute. I think there's no meaningful basis to do that, just based on the planning boundaries that they came up with. But that's- Absent- That's your basic theory, that anything within the park can be used for anything else within the park. Well, this is not with- just with- let me just say, first of all, this is not within the park, just within the park. This is within- if you look at this map, you can see 603. In fact, 603 and 605 now are where the Presidio Park lands. Now that Doyle Drive is done, this one is going to come right across from the end of the main parade, across Doyle Drive, and down to Crissy Field, where these buildings were. That is- it's like a continuous view now from the main parade. So, it's not a separate area. But I do want to make the point about- Can I just- you know, it's very hard to understand what your position is, as you argue today and as I read the briefs, because in your update in the construction and how you got to minus 1,500, I thought you were not including these buildings that are on the way down to Crissy Field. I thought you were including the ones, I guess what I'll call on this side, meaning the parade side on Doyle Road. Am I wrong about that? You're correct. No, it is the trust's position that it is not limited to rebuilding- to replacing buildings in the same developed area as the one where they are demolished. And let me give you two reasons, please. But we could win even without the- Let's look at the facts first. I think your answer to Judge McCune's question is- I thought- I'm sorry? You're not including the acreage from across the highway. We have a primary position and a backup position. The trust's- We're just trying to figure out what's happening here, what you did for this update. In other words, did you include the demolished buildings down toward Crissy Field or not, in this- in doing the banking? It is not included in the update. It is include- because the trust's- Why are we arguing or talking about it? Maybe I'm missing something. Because even- because the trust- it's a backup position, right? The trust- Why don't you argue your best position, whatever that may be, because, you know, we could throw a lot of hypotheticals that would basically throw out your whole case, because it would be- some of them would be preposterous. Yes, I'd like to explain- so the trust's position is that they can replace buildings that are demolished in one developed area of the Presidio with buildings in another developed area of the Presidio, and that's for two reasons. One is the language of the statute, which says, in existing areas of development. So that language really is only necessary if it wouldn't- I mean, it doesn't say in the same existing area of development, right? It says in existing areas, and the purpose is to maintain open space and potentially to increase open space. And in the trust's 2002 plan, they had a proposal to demolish 800,000 square feet of 1950s apartments at Baker Beach, which are located in the recovery area for an endangered plant, the San Francisco lozenge, in the Fish and Wildlife Service plan. But because those apartments bring them $12 million a year in income, which they continue to need to maintain the Presidio without any federal funding, they have in the plan a proposal to replace less than half of that elsewhere in the Presidio. And you can see that there are net increases in their 2002 plan, which, by the way, the Presidio Historical Association signed onto the programmatic agreement for and is well aware of, with increases in constructed area in square footage in Letterman, in Fort Scott, and 90,000 on the main post. And how did the district court rule on that? The district court did not go to that. Because, first of all, it didn't rule on your main theory. And, second, it didn't rule on the development, which is not before us, right? I'm just trying to explain the interpretation of the statute and why and how the trust has interpreted it, how it's been applied, and how it's essential to both to achieving the goals of the plan. Yeah, the goals of the plan, you then go over to the, you know, historic trust and all the things you need to do. One of the key points that I think that the historical association makes is a pretty simple one, and that's the word replacement. And that replacement has a much more limited natural meaning in dictionary terms than the one you would give it. So even if existing structures might be ambiguous and similar size might be ambiguous, how is replacement in place of ambiguous? As we explained in our brief, what Congress had before it was the National Park Service's general management plan, and they used the term replacement construction. And we have various examples in our plan of where they planned to build a larger building without identifying where they were going to get the exact, it's the golf course, you know, I forget what page of our brief it's on, but it's in the middle there about the practicalities and the context. Given the context, Congress wasn't looking at a one-for-one replacement. And in addition, it doesn't, it is inconsistent with in existing areas of development. If replacement is in the same location. Now, the Presidio Trust agrees that you could go with, I mean, I don't know if it's ever mattered with this banking idea. It could be that they find the replacement at the time somewhere in the trust, and certainly that's happening here. We've identified a lot of everything that's being destroyed for Doyle Drive and the buildings that will replace that. One question, because this has come up several times. Judge Thomas has been, Chief Judge Thomas has been asking you about what the district court ruled. Did the district court rule on your entire, the entire proposal that you think is before us? Or, as I think I tried to ask before, are we only required to rule on the portion of the land that you say is necessary to this hotel or whatever you call it? Your proposal is broader than that, as I understand it. But the district court ruled on the principal part of that, but not on the entire proposal? Now, the district court upheld the Presidio Trust's approval of the main post update, which includes more than the lodge. That's the story. We're talking past each other a little bit, but I don't mean to frustrate you. But you want us to decide the entire project. The district court didn't do that, and we don't have to do that. I'm talking about the whole plan development, the banking theory, your primary plan. Oh, right. No, no. I'm just trying to explain. You are, but we're dealing with a finite proposal here, and we don't need to reach the broader issue, correct? You don't, but it would be difficult if the court said that it had to be in the same existing area of development. The finite proposal, as I understand it, is more than the lodge. It has additional development, which requires the use of something like 30,000 feet of replacement, as you would call it, that's across the highway. Yes. So that is something that you believe the district court decided and that we have to decide, not merely the lodge but the entire proposal. Yes, I do. Now, let me ask you, in terms of Park Service's deference, how could you come up with Chevron deference given the nature of this particular agency? What would I look to to say that there would be Chevron deference? I think you would look to that they were given authority from Congress both to issue regulations, which, of course, they didn't do here because it's regulating themselves, right, but in terms of themselves to be guided, the only thing it really says they're guided by, except for the purposes of the GGNRA Act and the objectives of the general management plan, which are very general, is to prepare a management plan that guides it. And that management plan must go through the NEPA consultation, notice and comment, the historic preservation consultations. It goes through everything basically that a rule would go through. It is equivalent process and it binds the presidio to it unless it's changed through a similar process. So in every sense, it's really the same as a rule and given them the authority to do that. But that argument only applies to your primary assertion about your rights because your secondary position, which is even if you look at the area, we're all right, was not the subject of rulemaking and therefore not the subject of Chevron deference, true? Well, it is a subset. I guess I would say it falls within that. We have a broader position, but I certainly think it falls within the broader position. It's almost a policy position, it seems to me. I mean, I don't see the trust in the policy position. I mean, if we disagreed with you, we would potentially look at Skidmore deference, right? Yes. But if we disagreed with that, if we really thought the nature of this is such that there's no particular deference of the way this is structured, would we be back to just figuring out the statute ourself? Well, if you don't accord any deference, I suppose that's true, but I think everything certainly deference is due to the agency that has made this work and is bound to make it work and bound to make it self-supporting and has the expertise. That has nothing to do with statutory gaps. We have to decide whether there's a statutory gap or whether the agency qualifies. Well, there's certainly a statutory gap. It does not mean what the plaintiffs say it means. It just can't. It's completely different. What do you think the term areas of development mean? How would we know what areas of development are? The trust has defined in its 2002 plan the generalized areas of development, and I could find a site for that if you want it now or I could provide it to you. A basis for it? You look at what is already there? You can see on the map of the generalized area of development. Oh, I don't know if it's in the excerpts of record, but I'd be glad to supply it for the court. It is in the Presidio Trust Management Plan. I just don't know if it's in the... I'm sorry. It's from the court opinion. Okay, it's in the... I'm sorry. Yes, it's in the court opinion. One of the... It's Exhibit 2. So you can see all the white areas are the existing areas of development. They're quite limited to areas that clearly have a lot of buildings. I do want to be sure to say regarding the Section 110F argument before I leave that the National Trust for Historic Preservation brief said you should defer to the Interior Department's interpretation. Our brief, from the Justice Department, was coordinated with Interior, and our brief represents Interior's position on the proper interpretation of Section 110F, that it is procedural. And, of course, every historic preservation entity that was involved in this with any kind of authority, including the National Trust for Historic Preservation, the State Historic Preservation Office, or the Advisory Council, and the Interior Department felt that all the adverse effects of the lodge had been resolved. Our questions are taking over time, but let me ask you one. I want to make sure we understand your alternate position. Assuming that the interpretation, the plainness, is correct, that it has to be in the vicinity, how do we determine whether or not the demolished buildings are in the vicinity? I think that's part of the problem. I guess I would defer to the Trust, and if it's unreasonable, if it's arbitrary and capricious, if what they determined was the vicinity, then I guess under that interpretation it would have to meet that standard. Certainly that standard is not here. But the Trust, I gather, did not undertake that analysis, did it? Admittedly, we've undertaken that analysis in the context of litigation because nobody has ever suggested that this longstanding policy that the Presidio Historical Association has endorsed in a programmatic agreement, that there was anything wrong with it. Right, but you're asking us to defer to an agency decision that hasn't been made, aren't you? You're deferring to your litigating position? Well, there are times when the court defers to a well-considered litigating position. That wasn't my question. My question was, aren't you asking us to do that? My question – I'm not trying to be tricky. I'm just asking you, did the agency consider this theory and decide on it? I think the answer to that is no because it relied on the banking theory for the entire Presidio. Am I correct? It did not – yes. I mean, as it turned out, once it was asked, there were buildings right nearby. Right. But that was not – that is not how they have interpreted the act before. Okay. Thank you. Thank you. Why don't we put five minutes on the clock? I'm trying to even it out. Your Honor. Just one second. There we go. Thank you. I'd like to clarify my response to Judge McKeown earlier about the definition of replacement and breaking up a replacement new construction. I think our position, our interpretation here is that you really need to stay within about the same footprint and be very close to that. So if you could keep six 5,000-square-foot buildings to replace Building 34 would be of similar size, but you would have to be able to fit them within the original footprint, not expanding that as we've done here. So not even two buildings? Two buildings, but again, within approximately the same footprint, that they couldn't reach over a much greater area. We'd have to stay within where that original existing structure was. Thank you for the clarification. Thank you. I'd also like to note that we – Doesn't your interpretation write out the statutory phrase, in existing areas of development, though? No, Your Honor. We do not believe that it does. We think this is a limitation on existing structures. That is, that new construction is limited to the replacement of existing structures in existing areas of development. The Presidio has over 800 buildings. Many of these are in isolated – What happens if you have an existing structure that's not in an existing area of development? What can you do about that? You can't do anything? The trust has broad authority to rehabilitate it, to repair it. They also have the discretion, if they cannot cost-effectively do so, to demolish it. But they would not be able to do – Couldn't replace it? No, Your Honor. Not under our interpretation. You mean if it weren't functioning properly, they couldn't demolish it and put in the same building? Your Honor, there are two different steps. They could certainly demolish it, but they could not replace it. But they want to update it. They want to have the same thing that functions. This one no longer functions. So they want to demolish it and replace it with the same kind of building that serves the same purpose. But it's not – they can do it if it's in an area of development. But the others you say that aren't in the area of development, they just have to demolish and they can't replace it? Yes, Your Honor. We believe they could repair it or demolish it. Well, that makes no sense. Your Honor, the trust is entrusted not just with preserving historic resources, but also with scenic resources and recreation. I know it's scenic, but that doesn't mean you have to demolish useful buildings that no longer function well, replace them with the same building that functions, and you say you can't do that? No, Your Honor. We do not believe they can. We believe that they can rehabilitate. That doesn't help you win the argument, I don't think. How would you define, then, existing areas of development? We don't disagree that there are general areas of development throughout. Those have been defined by the trust? Yes. But we don't think they're useful and that they can lead to this banking scheme, even within one of those. So, in other words, you, in effect, you don't disagree with their characterization on one of these maps as to what is existing areas of development? No, Your Honor. I think we're in agreement on that. And you would just say if you had an isolated building out in what has now become more of a natural preserve, that that's not an existing area of development, even though there's a building there? Yes, Your Honor. That if you demolish that building, there's no longer development there and you cannot replace it. Of course there wouldn't be if you demolished it, but what if it's while it's there? How do I know that's not an area of development? Is it development when it was built? Is it development today? Yes, Your Honor. I mean, how do I know that? Doesn't that make the statute ambiguous, though? We don't believe so, Your Honor. We think this is simply a further limitation and that it's clear from the layout of the presidio when you have a building. But how do I know? I mean, what seems to be is you're mixing and matching arguments between historical character and then this statute. So if I take this phrase, existing areas of development, there's no definition of that, right? That's correct. And so you have to give it some definition. Yes, and we don't. Are there existing areas of development that the trust has identified? I think in Exhibit 2 we were told there are existing areas of development. The trust has identified administrative planning boundaries, and we don't disagree that those represent areas of development. We think this is simply a limitation on new construction. Is the areas of development what existed before or what's happening now? We believe ‑‑ I mean, I would say before, Your Honor, but these should be roughly the same because any ‑‑ No, no. I'm just asking. I'm just trying to understand that phrase. You know, we've got about four phrases in this tiny little excerpt that we need to interpret. So I'm just trying to understand. If I look at it, it says existing areas of development, and you have Judge Reinhart's building, which he wants to knock down and put a more functional one up. Why wasn't that an existing area of development before he knocked down the building, even though it was one building? If it's an isolated structure, we don't believe that's an area of development, and that's ‑‑ this is just a limitation of the trust. These areas of development that the trust has identified, are those separate areas of development? Are there a series of areas of development within Exhibit 2? There are a series of ‑‑ throughout the Presidio, there are multiple areas of development, and then there are largely undeveloped spaces that have some isolated buildings, some non‑historic buildings that we think are eligible for demolition. So I could look at that map and say, here's area development 1, here's area development 2, et cetera. Yes, Your Honor. We believe you could look at the trust planning boundaries to identify areas of development. I see that my time has expired. Thank you. Thank you, Counsel. The case just heard will be submitted for decision, and we'll proceed to the next case on the oral argument calendar, Ardoin v. Arnold.
judges: Thomas, Reinhardt, McKeown